UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| CHRISTOPHER BALZER, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CASE NO. 2:08-CV-241-TS |
| AMERICAN FAMILY INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

After the Plaintiff, Christopher Balzer, was injured in a car accident and settled his injury claim with the other driver's insurance company, he pursued an underinsured motorist (UIM) claim with his insurer, Defendant American Family Insurance Company. American Family declined to offer the Plaintiff any additional money for his claim and the Plaintiff filed this suit alleging breach of the insurance contract, negligence, and bad faith and seeking compensatory and punitive damages. This matter is before the Court on the Defendant's Motion for Partial Summary Judgment [ECF No. 44]. The Defendant seeks judgment as a matter of law on the Plaintiff's bad faith, breach of contract, and punitive damages claims.[1] The Motion has been fully briefed and is ripe for this Court's consideration and ruling.[2]

---

[1] In their Motion, the Defendants assert that they are also seeking summary judgment on the Plaintiff's negligence claim. However, inclusion of the negligence claim in the Motion appears to be in error as the Brief in Support [ECF No. 45] does not address the negligence claim and the Motion is clearly designated as partial.

[2] The Defendant has also filed a Motion to Exclude [ECF No. 46] directed at the Plaintiff's liability expert, Stacy Gleason, and at the Plaintiff's "non-retained" damages experts. The Defendant requests that Gleason be prohibited from testifying at trial because her report lacks the substance required by Rule 26(a). The Defendant submits that because the Plaintiff's treating physicians, whom she designated as non-retained, have not produced any reports, their testimony should be limited to their treatment, diagnosis, and observations of the Plaintiff. This Opinion and Order does not address the

**STANDARD OF REVIEW**

The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56.1(a) (stating that the movant must provide a "Statement of Material Facts" that identifies the facts that the moving party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed in Rule 56 to designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56.1(b)

---

Motion to Exclude. To the extent it is necessary to address the admissibility of Gleason's testimony as it relates to the pending motion for partial summary judgment, the Court will undertake that discussion where appropriate within the text of this Opinion and Order.

[3] A new version of Federal Rule of Civil Procedure 56 went into effect on December 1, 2010. The purpose of the revisions to the Rule was to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. Fed. R. Civ. P. 56, Committee Notes for 2010 Amendments. The amendments are not intended to effect continuing development of the decisional law construing and applying the standard for granting summary judgment, which remains unchanged. *See* Fed. R. Civ. P. 56(a) & Committee Notes for 2010 Amendments.

(directing that a response in opposition to a motion for summary judgment must include "a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary"). According to Rule 56:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). *See also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

## FACTUAL BACKGROUND

On the morning of November 16, 2006, the Plaintiff was driving to work when Richard

Colburn drove directly into his path. The Plaintiff T-boned Colburn's vehicle, sustaining about $2,700 in damages to his own vehicle. The Plaintiff was able to drive his truck away from the scene, repair the damages, and drive it for years later. The crash caused the Plaintiff to hit the back of his head against the rear window of his truck.[4] He told the responding police officers that he hit his head and it was sore but that he didn't think much of it. The Plaintiff declined the officers' offer to call an ambulance, saying that his head hurt some, but he thought it would be okay. He was shaken up. The Plaintiff did not go to an emergency room, but he did see his doctor later that day.

At the time of the accident, Colburn carried insurance with State Farm Mutual Automobile Insurance Company of Bloomington, Illinois. Colburn's policy with State Farm contained a liability limit of $100,000 per person. The Plaintiff negotiated his claim with State Farm for seventeen months after the accident. By letter dated May 1, 2008, the Plaintiff, through his attorney Terrence Rubino, notified the Defendant that State Farm had tendered the policy limits of $100,000 in settlement of the Plaintiff's claim against Colburn and requested that the Defendant grant him permission to accept the settlement. In addition to requesting consent to accept State Farm's settlement offer, Rubino stated that he was enclosing a copy of the Plaintiff's Specials Summary and medical records for review and evaluation in furtherance of a UIM claim. The Specials Summary showed that the Plaintiff had incurred $25,030.77 in medical

---

[4] In his Designation of Material Facts, the Plaintiff submits that the impact caused his "head to slam hard against the back window of his pickup." (Pl.'s Designation ¶ 11, ECF No. 51.) In support of this statement, the Plaintiff cites his deposition at page 33. The following testimony is found on page 33 of the Plaintiff's deposition: "I hit my head against the rear window." (Pl.'s Dep. 33, ECF No. 51-3 at 5.) There is no indication of the level of force within which the Plaintiff's head struck the window. It is undisputed that the window did not crack, that the Plaintiff was not rendered unconscious, and that he drove away from the scene of the accident.

expenses. The letter did not indicate how much compensation the Plaintiff was seeking for the UIM claim.

There was no dispute that Colburn was solely at fault in causing the crash. On May 29, the Defendant gave the Plaintiff permission to accept State Farm's the tender without compromising his UIM claim. The Defendant, without being asked, also waived any subrogation rights to recover $5,000 that it had previously paid to the Plaintiff's medical providers.[5] The Plaintiff's policy with the Defendant included UIM coverage as follows:

> [American Family] will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle. . . . The bodily injury must be sustained by an insured person and must be caused by an accident and arise out of the use of the underinsured motor vehicle.

(Pl.'s Compl., Ex. A., ECF No. 1 at 10.)

On May 12, claims examiner Jeneen Rucker received the Defendant's file from her supervisor, Mindy Lantrip. Rucker's review of the Plaintiff's medical files revealed that he had numerous preexisting medical problems. On May 29, Rucker sent the records to Jamie Tebbe, a nurse in the Defendant's Medical Services Department, who was tasked with reviewing the file to determine if all of the Plaintiff's complaints and injuries were related to his November 16, 2006, accident. Tebbe reviewed the medical records that were contained in the Plaintiff's filed, including those from the Ear Institute of Chicago, Northwest Indiana Neurologic Institute, Nitan Sardesai, M.D., Joseph C. Legaspi, M.D., APT Plus, OrthoIndy, Community Hospital, University of Chicago, DuPage Neurologic Associates, and Timothy C. Hain, M.D. On June 12,

---

[5] The Defendant had paid $5,000 to the Plaintiff's healthcare providers within two months of the accident and notified State Farm of its subrogation interest, expecting that it would be repaid in the event that the Plaintiff settled his dispute with State Farm.

Tebbe completed her review and summarized her findings as follows:

> Mr. Balzer was actively treating for sinusitis, neck (cervical disc heriation), low back, right hand, and left upper extremity conditions at the time of the [Motor Vehicle Accident] MVA. Occipital neuralgia had been treated within 8 months of the MVA. Mr. Balzer was on multiple medications and had received Botox and occipital nerve block injections in the months prior to the MVA. Pre-accident medical records support the patient's medical conditions required sporadic treatment for flare-ups of his cervical pain and occipital neuralgia without any known cause.
> The patient refused any emergency treatment at the scene but did seek care from his primary care physician on the date of the MVA, and diagnosed with a cervical strain. The patient was also evaluated by OrthoIndy who also diagnosed a cervical strain. The cervical strain was treated with physical therapy and Skelaxin. All other treatment is not related to the MVA.

(Tebbe Medical Services File Referral Response, ECF No. 45-3 at 25.) Tebbe made additional findings related to loss of wages and disability. Specifically, she noted that the Plaintiff was already on work restrictions of ten pounds lifting at the time of his injury and that even though he was attempting to get disability for vertigo, the vertigo was not related to the MVA as no head injury was diagnosed after the accident. In the more detailed portion of her report, Tebbe listed the medications that the Plaintiff was taking prior to the MVA, many of which listed headaches and dizziness as side effects. She also reported that by December 21, 2006, the Plaintiff's was reporting less pain during physical therapy than he had been reporting before the accident.

Tebbe's sent her findings to Rucker for use in determining how much, if any, additional compensation American Family would offer the Plaintiff. Rucker discussed the claim with Lantrip, who concluded that the $105,000 the Plaintiff already received was fair compensation for the injuries that were attributable to the accident. Rucker agreed with this conclusion and, on August 5, American Family notified the Plaintiff that it believed he had been fairly compensated by State Farm's payment of $100,000, and that it was not making any offer to settle his UIM

claim.

On September 18, the Plaintiff filed a Complaint for damages against the Defendant, alleging breach of contract, negligence, and bad faith.

**DISCUSSION**

A federal court sitting in diversity applies state substantive law and federal procedural law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). The parties agree that the substantive law applicable to this case is the law of the State of Indiana. *Camp*, 553 F.3d at 505 (noting that because none of the parties raised a choice of law issue, the substantive law of the forum state applied). The court's duty is to apply Indiana law as it believes the highest court of the state would apply it if the issue were presently before that tribunal. *State Farm Mut. Auto Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001). "When the state Supreme Court has not decided the issue, the rulings of the state intermediate appellate courts must be accorded great weight, unless there are persuasive indications that the state's highest court would decide the case differently." *Id.*

**A.     The Bad Faith Claim**

"Indiana law has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Erie Insurance Co. v. Hickman*, 622 N.E.2d 515 (Ind. 1993). While there is no exhaustive or exclusive list of bad faith actions that an insurer can take, the obligation of good faith and fair dealing includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in

7

making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim. *Monroe Guar. Ins. Co. v. Magwerks Corp.,* 829 N.E.2d 968, 976 (Ind. 2005) (quoting *Hickman*, 622 N.E.2d at 519). For example, an insurer that denies liability "knowing that there is no rational, principled basis for doing so had breached its duty." *Hickman*, 622 N.E.2d at 520; *see also Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002) (holding that to prove bad faith in the denial of an insurance claim, "the plaintiff must establish . . . that the insurer had knowledge that there was no legitimate basis for denying liability"); *Monroe Guar.*, 829 N.E.2d at 976 (holding that in cases where bad faith is alleged due to denial of coverage, a plaintiff must establish that insurer had knowledge that there was no legitimate basis to deny liability); *Allstate Ins. Co. v. Clancy*, 936 N.E.2d 272, 279 (Ind. Ct. App. 2010) (stating that an insurer that denies liability knowing that there is no rational, principled basis for doing so has breached its duty of good faith). "As a general proposition, '[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.'" *Monroe Guar.*, 829 N.E.2d at 977 (citing *Colley v. Ind. Farmers Mut. Ins. Group*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)).

A good faith dispute about the amount of a valid claim or about whether the insured has a valid claim does not supply the grounds for a bad faith claim. *Hickman*, 622 N.E.2d at 520; *see also Monroe Guar.*, 829 N.E.2d at 976. "This is so even if it is ultimately determined that the insurer breached its contract. That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." *Hickman*, 622 N.E.2d at 520. "Similarly, the lack of diligent investigation alone is not sufficient to support an award." *Id.*

As these rulings highlight, a successful bad faith claim is composed of an objective

element (such as the lack of a reasonable basis to deny a claim) and a subjective element (such as the knowledge of the lack of a reasonable basis to deny a claim). To be successful at trial, the Plaintiff would have to establish by a preponderance of the evidence that the value of his claim was not subject to a good faith dispute, and that the Defendant was aware that it was not. *See Anderson*, 477 U.S. at 252 (holding that whether there is a genuine issue for trial depends on whether there is sufficient evidence for a jury to return a verdict for that party applying the substantive evidentiary standard of proof that would apply at a trial on the merits); *Knight v. Wiseman*, 590 F.3d 458, 464 (7th Cir. 2009) ("[T]he evidence submitted in support of the nonmovant's position must be sufficiently strong that a jury could reasonably find for the nonmovant.") With this standard of review in mind, the Court concludes that the Plaintiff's designated evidence would not convince a jury that the Defendant had no objective reasonable basis to deny his UIM claim, or that the Defendant was aware that it had no reasonable basis to dispute his claim. Rather, the undisputed facts demonstrate that the Defendant had a rational, principled basis for evaluating the Plaintiff's claim and determining that $105,000 fully compensated him for the injuries that were attributable to the accident. As is discussed more fully below, the Defendant's disagreement with the Plaintiff concerning the value of his claim and regarding the manner of investigation does not create a genuine issue of material fact on each element of a bad faith claim upon which the Plaintiff would bear the burden at trial.

      The Plaintiff argues that the Defendant had no principled, rational basis for denying him further compensation under his UIM coverage, "choosing to completely disregard unrefuted evidence" of his "injuries, disability, and lost wages." (Mem. of Law 5, ECF No. 50.) In support of his claim that the evidence supports an inference of bad faith, the Plaintiff points to the

9

following: (1) Tebbe ignored the fact that the Plaintiff complained of head pain to the responding officer at the scene of the accident; (2) Tebbe was not qualified to give an opinion on medical records related to neurology and a vertigo diagnosis; (3) Tebbe intentionally omitted Dr. Hain's diagnosis of post-traumatic vertigo; (4) Tebbe relied only on her review of the medical records instead of contacting treating physicians or interviewing the Plaintiff; (5) the Defendant did not use software programs designed to evaluate bodily injury claims; (6) the Defendant did not provide any basis for denying the Plaintiff's wage claim; and (7) Tebbe did not offer a plausible explanation why the Plaintiff developed a disability and inability to work. In essence, the Plaintiff claims that those persons responsible for reviewing his claim purposefully disregarded facts and evidence in support of a finding that his injuries were the result of the November 16, 2006, accident, and that they failed to use specific objective measurements to determine the cause of his injuries. The Plaintiff argues that these actions demonstrate that the Defendant's practices regarding the handling of UIM claims were "'geared toward" denying compensation regardless of [the] Plaintiff's needs and rights." (Mem. of Law 8, ECF No. 50.)

1.  *Head Pain/Injury*

The Plaintiff claims that Tebbe was, at best, purposefully ignorant of the facts when she stated that the Plaintiff did not sustain a head injury in the crash. In support of this assertion, he points to the fact that he complained of head pain to the responding officer at the scene of the crash. The Plaintiff appears to be suggesting that complaints of head pain immediately after the accident are the equivalent of a medical diagnosis of a head injury. This, of course, is not true. In addition, the record reveals that Tebbe did consider the possibility of a head injury as the cause

of the Plaintiff's vertigo, but dismissed it, noting that neither his accident report nor examination revealed a blow to the head or loss of consciousness. She also reported that the Plaintiff declined emergency treatment at the scene and that the doctor who saw him on the date of the accident, November 16, 2006, diagnosed him with a cervical strain. She indicated that this same diagnosis was given by Dr. John Dietz from Othro-Indy on December 1. Although the Plaintiff points to his complaints of head pain as proof that he suffered a head injury, he does not argue that any of Tebbe's findings were false or otherwise identify the nature of his alleged head injury, i.e, contusion or concussion, hematoma, or skull fracture. In light of the record before Tebbe, no reasonable factfinder would conclude that she lacked a principled, rational basis, to conclude that he did not suffer a head injury in the accident despite complaining of head pain immediately after the accident. Even if Tebbe's analysis was ultimately wrong, the Plaintiff's designated evidence reveals only that there existed a good faith dispute about the nature of his injuries.

**2.     *Tebbe's Qualifications***

The Plaintiff argues that the Defendant did not conduct a fair and careful review of his medical records because the nurse who undertook the review, Tebbe, was not qualified in the area of neurology and could not give an expert opinion as to the medical causation of injuries. He argues that Tebbe should have recommended an examination of the records by a physician or specialist who was qualified as a matter of law and fact to give an opinion on medical records related to neurology and vertigo. The Defendant responds that Indiana law does not require insurance companies to review an insured's claim using specialists that would be qualified to testify as experts in court with the regard to an insured's particular diagnosis.

The Plaintiff has not pointed to any legal authority in support of his claim that Tebbe should have recommended that a physician or specialist review his claims. The only evidence the Plaintiff provides to support the assertion that the Defendant violated its duty of care to the Plaintiff is the report of Stacy Gleason, the Plaintiff's retained expert. Gleason is a former insurance claims handler with seven years' experience. She states that this was a case involving a neurological condition that both Rucker and Tebbe were unqualified to review, which "makes absolutely no sense." (Gleason Report, ECF No. 45-6 at 6.) She asserts that Rucker had a responsibility as the claims handler to conduct a thorough and legitimate review of the information and that if she was not in a position to conduct such a review "it was necessary to locate the proper medical professional to do so." (Gleason Report, ECF No. 45-6 at 6.) Gleason's conclusions assume that the Defendant could only satisfy its duty to conduct a thorough review of the Plaintiff's claim by having a physician in the neurology field review the file and render an opinion regarding whether the Plaintiff's treatment was related to the accident of November 16, 2006. However, she provides no basis for this assumption. Gleason makes no attempt to compare Tebbe's handling of the claim with industry standards or otherwise provide any foundation for her opinion on what individuals would be qualified to review the Plaintiff's claim. With respect to an allegation of bad faith, it is not even clear what such testimony, had it been provided, would have accomplished. Even if the failure to recommend that a specialist review the file could be deemed a lack of diligent investigation, that alone is not sufficient to support an award for bad faith.[6] Moreover, the medical records from those medical providers who were

---

[6] It is questionable how persons who are alleged to be unqualified can also be said to know that there is no legitimate basis for denying a claim. In this regard, the Plaintiff's claim is more akin to an allegation that the Defendant committed bad faith in the manner of its handling his claim. In *Magwerks*, the insured asserted that the duty to deal in good faith also included the "manner of handling the claim."

presumably qualified do not conclusively agree or establish that the Plaintiff's vertigo was a result of his accident. This uncertainty regarding the cause of the vertigo, particularly in conjunction with Tebbe's analysis of the Plaintiff's preexisting conditions and the only $25,000 in reported medical expenses, suggests a good faith dispute regarding the value of the Plaintiff's claim, not that Tebbe had knowledge that there was no legitimate basis for denying to compensate him beyond the $105,000 that the Plaintiff already received.

3.  *Dr. Hain's Records*

The Plaintiff claims that Tebbe "intentionally omitted pertinent, medically uncontroverted language from the treating physician's reports," (Mem. of Law 7, ECF No. 50), specifically Dr. Hain's statement that the Plaintiff's benign paroxysmal positional vertigo (BPPV) was "most likely post traumatic," (Pl.'s Designation of Material Facts ¶¶ 43–44, ECF No. 51). Although the Plaintiff is correct about what Dr. Hain wrote, he is mistaken that Dr. Hain's statement was uncontroverted. On March 2, 2007, Dr. Richard Wiet of the Ear Institute of Chicago assessed the Plaintiff's condition at the request of Dr. Hain. He wrote that it was "unclear" if his cervical vertigo "is post traumatic, or at least it may have been exacerbated by trauma." (ECF No. 48-5 at 10.) Dr. Wiet stated that he was uncertain because the Plaintiff had an MRI showing significant cervical disease prior to the crash. Dr. Wiet also stated that it was only "possible" that the Plaintiff even had BPPV. The Plaintiff was taking medication that prevented

---

829 N.E.2d at 976. Because the insured did not elaborate on the contours of this duty and neither party provided the court with much guidance on the issue, the Indiana Supreme Court declined to expand on the extent of the duty an insurer owes its injured beyond those already expressed in *Hickman*. *Id.* Here, the Plaintiff likewise fails to explain the contours or provide any guidance regarding such a duty, either in general or as it relates to the level of medical expertise that person reviewing a medical file must possess.

his condition from being triggered during Dr. Wiet's assessment, and Dr. Wiet concluded that he would only perform the procedure in question if he first had objective evidence of BPPV that was reproducible over several exams.

The medical evidence was not clear and indisputable. Nevertheless, the Plaintiff claims that the failure to include Dr. Hain's assessment creates an inference of bad faith and constitutes an artifice designed to deny or limit claims. The Plaintiff's designated evidence fails to move this allegation beyond the realm of speculation, and inferences relying on mere speculation or conjecture will not suffice to show a genuine issue for trial. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).[7] Tebbe noted prior injuries and medical conditions, work restrictions, the injuries that were diagnosed following the accident, the Plaintiff's return just over a month after the accident to pain levels that were lower than pre-accident levels, the traditional causes of BPPV, the Plaintiff's medications, and his medical history following the accident. She also noted the treating sources that indicated that the Plaintiff's vertigo could be related to the accident. Although the Plaintiff may disagree with the weight Tebbe assigned to these factors, nothing in the record suggests that Tebbe purposefully mischaracterized the Plaintiff's records, that her findings were not based on disputed medical conclusions by the Plaintiff's physicians , that Tebbe should have known that the Plaintiff's vertigo was related to the accident, or that the

---

[7] The Plaintiff's expert, Gleason, accuses the Defendant of failing to consider all of the information sent to her and only pulling information that would lead to a denial of the Plaintiff's claim. Gleason posits that Tebbe and Rucker "were searching for reasons to deny [the Plaintiff's] claim, rather than searching for reasons to compensate him." (Gleason Report, ECF No. 45-6 at 7.) This sweeping conclusion about Tebbe's and Rucker's states of mind, in addition to being speculative, does not address the relevant issue: whether the reasons the Defendant cited provided a reasonable basis to dispute the value of the Plaintiff's UIM claim.

Defendant was aware of any error in Tebbe's review.

**4.     *Review of Medical Records***

The Plaintiff asserts that Tebbe did not contact the treating physicians and routinely does not examine or interview the insured, but relies solely on medical records. This assertion does not change the fact that the Defendant, in reviewing the medical records, offered a legitimate basis for denying the Plaintiff's UIM claim. *See Wilson v. Am. Family Mut. Auto. Ins. Co.*, 683 F. Supp. 2d 886, 892 (S.D. Ind. 2010) (holding that American Family's decision not to request an independent medical exam or interview additional witnesses did not amount to bad faith). Nor does this manner of review reasonably suggest that the Plaintiff's UIM claim was wrongfully denied. *Cf. Kartman v. State Farm Mut. Auto. Ins. Co.*, — F.3d —, 2011 WL 488879, at *6 (7th Cir. Feb. 14, 2011) (stating that to prove that an insurance company committed the tort of bad faith in Indiana, a plaintiff must establish that his claim was underpaid or wrongfully denied in the first place).

**5.     *Use of Software Programs to Quantify Losses***

The Plaintiff criticizes the Defendant for not using objective software programs to evaluate his bodily injury claims despite being aware of such programs. The Defendant states that it does not typically consult such sources. The Plaintiff again appears to be advancing a claim based on the manner of handling the claim, but he does not first identify the source of any duty to use such programs or identify the obligations that would exist upon receiving the program's results. As stated above, the lack of diligent investigation alone is not sufficient to

support an award for bad faith. In addition, the Plaintiff does not explain how using such a program would have altered the Defendant's conclusion that $105,000 sufficiently compensated him for his accident-related injuries. The Defendant's failure to use Colossus® or another software program to evaluate the Plaintiff's claim does not suggest an unfounded refusal to fully pay his claims or create a reasonable inference that the Defendant had knowledge of an unfound refusal.

**6.**     *Wage Loss Claim*

The Plaintiff has not worked since the accident. He argues that the Defendant disregarded his wage loss claim without understanding what his job duties entailed or how his ability to work could be inhibited by his neurological symptoms. He also argues that after Tebbe disregarded reports from his treating medical doctors, she offered no other plausible explanation for why he developed a disability that rendered him unable to return to work. The Plaintiff is mistaken regarding Tebbe's presentation of a plausible explanation. The Defendant articulated a rational, principled basis for concluding that his vertigo, and any resulting work restrictions, were not related to his accident because he was not diagnosed with any head injury after the accident and his BPPV could be explained by other factors. It is unclear how a more thorough understanding of the Plaintiff's work duties would have altered this conclusion regarding the cause of his symptoms.

In sum, although reasonable people could disagree regarding the cause of the Plaintiff's vertigo, the Plaintiff has not presented evidence from which a reasonable jury could conclude that the Defendant denied his UIM claim knowing that there was no rational, principled basis for

doing so.

**B.      Punitive Damages**

The Plaintiff maintains that punitive damages are recoverable on his bad faith claim. In Indiana, punitive damages are available only

> if there is clear and convincing evidence that the defendant "acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, in the sum [that the jury believes] will serve to punish the defendant and to deter it and others from like conduct in the future." *Bud Wolf Chevrolet, Inc. v. Robertson*, [519 N.E.2d 135, 137–38 (Ind. 1988).]

*Hickman*, 622 N.E.2d at 520. Proof that a tort was committed is not sufficient to establish the right to punitive damages. *Id.* The facts of this case, as outlined above, do not evince a conscious wrongdoing or egregious action that would allow a reasonable factfinder to award punitive damages. Rather, the evidence is that, regardless of whether its decision was correct, the Defendant's refusal to offer payment for the UIM claim was made in good faith and upon a rational basis. Accordingly, the Defendant is entitled to judgment as a matter of law on the Plaintiff's claim for punitive damages.

**C.      Breach of Contract**

According to the insurance contract, the Defendant agreed to "pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle." (Pl.'s Compl., Ex. A.) The Plaintiff made a claim for UIM coverage and the Defendant rejected it, believing that he was fully compensated by the settlement from State Farm and the Defendant's $5,000 of medical payments. The Plaintiff

17

claims that the Defendant breached its insurance contract with him when it made no offer to pay, and did not pay, him compensatory damages for bodily injury that he was legally entitled to recover from an owner of an underinsured motor vehicle. The Defendant asserts that it "never denied" the Plaintiff's claim or contended "that he wasn't entitled to coverage under the policy," but concluded that he had been fairly compensated by payment of Colburn's $100,000 limit and $5,000 in medical payments. (Def.'s Br. in Support 16–17, ECF No. 45.) The distinction the Defendant attempts to make is not clear. The fact remains that the Defendant did not pay the Plaintiff any compensatory damages for bodily injury that he was legally entitled to recover from the operator of an underinsured motor vehicle. Whether this failure was in breach of the insurance contract because the Defendant was mistaken when it concluded that the Plaintiff's compensatory damages did not exceed $100,000 is not amenable to summary judgment on the record currently before this Court. It remains for a jury to determine the nature and extent of the injuries and damages caused by the Plaintiff's accident with Colburn.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Partial Summary Judgment [ECF No. 44] is GRANTED IN PART and DENIED IN PART. The Motion is granted with respect to the bad faith claim and demand for punitive damages, and is denied with respect to the breach of contract claim. The Plaintiff's negligence claim is still pending.

SO ORDERED on March 28, 2011.

                                                 s/ Theresa L. Springmann
                                                THERESA L. SPRINGMANN
                                                UNITED STATES DISTRICT COURT
                                                FORT WAYNE DIVISION